**H.L. HAYDEN CO. OF NEW YORK, INC., Schein Dental Equipment Corp., Plaintiffs,**

v.

**SIEMENS MEDICAL SYSTEMS, INC., Healthco, Inc., Patterson Dental Co., Defendants.**

No. 84 Civ. 0306 (GLG).

United States District Court, S.D. New York.

Oct. 9, 1987.

Anderson, Russell, Kill & Olick, P.C., New York City, for plaintiffs; John E. Daniel, Peter B. Friedman, Lawrence Kill, Deborah A. Swindells, of counsel.

Kaye, Scholer, Fierman, Hayes & Handler, New York City, for Defendant Siemens Medical Systems, Inc.; Michael D. Blechman, Robert B. Bernstein, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for defendant Healthco, Inc.; Paul E. Levine, of counsel.

Mayer, Brown & Platt, New York City, for defendant Patterson Dental Co.; Michael Mills, of counsel.

## OPINION

GOETTEL, District Judge:

One of the phenomena of the last half of the Twentieth Century has been the extent to which economic battles have been waged in the courthouse rather than in the marketplace. On the basis of many thousands of pages of briefs, affidavits and exhibits, we are called upon to decide the motions and cross-motions for dismissal and/or summary judgment as to plaintiffs' nine causes of action and the defendants' nine counterclaims in this case which, at its core, is an antitrust action, but which includes a veritable potpourri of legal claims.

*Procedural Background and Jurisdiction*

Plaintiffs H.L. Hayden Company of New York, Inc. ("Hayden") and Schein Dental Equipment Corp. ("Schein D.E.") commenced this action against defendants Siemens Medical Systems, Inc. ("Siemens"), Healthco International, Inc. ("Healthco"), and Patterson Dental Co. ("Patterson") for alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Robinson Patman Act, 15 U.S.C. § 13(a), (c), (e) and (f). We have jurisdiction pursuant to 15 U.S.C. §§ 4, 15, 22 and 26. Plaintiffs also assert pendent state claims of alleged Donnolly Act (N.Y. Gen. Bus. Law § 340) violations, interference with contractual and business relations, disparagement of business reputation, unfair competition, and prima facie tort.

Defendant Siemens has counterclaimed, alleging that plaintiffs have violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), sections 349, 350, 350-a, 368-d, and 393 of the General Business Law of the State of New York, and common law principles prohibiting unfair competition, and have tortiously interfered with contractual relations. Furthermore, defendant Siemens claims that plaintiffs have engaged in fraud and defamation to injure Siemens. Defendant Healthco has raised a single and novel unfair competition claim against plaintiffs for "free riding."

After two years of discovery, lengthy and frequent conferences, thousands of pages of pleadings, depositions, motions, orders, memoranda decisions, affidavits and exhibits, the parties move to dismiss or for summary judgment on the claims or counterclaims asserted against them. Maintaining some semblance of order and clarity in discussing our decisions in this case is a daunting task. Liberal use of headings and subheadings will make our assignment, and hopefully the reader's, easier.

## I. Facts

Defendant Siemens is the American division of Siemens Aktiengesellschaft ("Siemens AG") of West Germany, with headquarters in Iselin, New Jersey. Siemens' principal product line in the United States is dental x-ray equipment. Its products are high quality and relatively high-priced, and Siemens fancies itself as the "Mercedes" of the dental x-ray equipment market. Although Siemens as a supplier is somewhat unique (to the extent that it truly may be the "Mercedes" of dental x-rays), the x-ray market itself is highly competitive and provides consumers with a wide range of product choices and prices.[1]

Siemens sells two types of dental x-ray equipment: (1) intraoral, which takes pictures of quadrants of the patient's mouth; and (2) panoramic, which shows the patient's entire mouth and jaw. Both types of dental x-ray equipment are complex, consisting of hundreds of integrated circuits and computer microchips designed to produce high quality images while exposing patients to the least possible amount of radiation. The equipment is subject to regulation under the Radiation Control for Health and Safety Act of 1968, 42 U.S.C. § 263b *et seq.*, and regulations promulgated thereunder. There is no material dispute as to the fact that assembly, installation, calibration and servicing all affect the quality and possible safety of a dental x-ray.

Siemens originally marketed its dental x-ray through its own sales personnel. In 1975, in an effort to reduce costs, Siemens instituted a new "Marketing Program" under which it began to sell its products through a nationwide network of authorized, full-service dealers. "Full-service dealers" assemble, install, calibrate, and maintain dental x-ray equipment, visit dentists' offices to maintain personal contact with dentists and their staffs, and educate customers about the equipment and its value. Providing the full range of these services obviously adds to the dealers' costs of doing business. Since institution of its "Marketing Program," Siemens relies on its full-service dealers to interface directly with dentists and to promote Siemens' products. Under this plan, Siemens would honor warranties for its dental x-ray equipment only if the authorized retailer who sells the equipment also assembles, installs, calibrates and services that product.[2]

1. In 1981, 95% of the dental x-ray equipment manufacture sales in the United States was comprised of Belmont, General Electric (now Gendex), Phillips (intraoral only), Ritter, Dentalez (panoramic only), S.S. White (attachments for intraoral x-ray units only), and Siemens. The remaining 5% included Healthco, which introduced its own intraoral x-ray equipment, Lumix, in 1981, Yoshida–Kayco, Sanko, Vacudent, MDT, Excell, Min x-ray, Moss, and Portaray. Siemens' sales of panoramic equipment increased from 32% in 1982 to 41% in 1983, although their sales of intraoral equipment declined from 25% to 8% during that period. General Electric (Gendex) lost percentage points in its sales of panoramic equipment, going from 29% to 16%, while S.S. White, a company which left the market in 1985, lost sales in the intraoral market, going from 22% in 1982 to 14% in 1983.

Dentists obviously have a wide choice in selecting a brand of dental x-ray equipment, and there is serious price competition between the different brands, as well. For instance, Healthco's Lumix in 1982 was 35% lower in price than Siemens' intraoral equipment. In August, 1983, the recommended retail price of Siemens' intraoral unit (Heliodent) was $4,650, compared to Lumix's $3,295 and Belmont's $2,595. In light of this substantial price competition, the Torrey Reports (Dental Equipment Sales Report) concludes that Siemens' overall market share of 31.3% in 1983 had declined to 25.6% in 1985, and its intraoral market share had dropped from 28.2% to 18.0%.

2. Dental equipment dealers customarily sell products manufactured or distributed by many different companies. Accordingly, as part of its "Marketing Program," Siemens has a service department to offer product support and to train, update and monitor dealer service technicians. At dealer training seminars, a Siemens field technician demonstrates installation of Siemens' equipment, evaluates the technical competence of the dealers' service technicians, and checks individual dealer locations to ensure that adequate tools, spare parts, and product manuals are available. The field technician then completes a "Training Familiarization Course" form that Siemens keeps on file. Siemens' technical representatives also provide on-the-job training by accompanying dealer service personnel to installation locations. The technical representative completes a "service report" on each such visit. Siemens also monitors its dealers by requiring them to complete and return a "Quality Assurance Checklist" for each dental

By 1982, there were 335 authorized Siemens dealer locations. Defendants Healthco and Patterson, the two largest national chains operating as full-service dealers of retail dental equipment, are also two of Siemens' largest suppliers. In the fiscal year 1982 (October 1981 through September 1982), Healthco represented roughly 30% of Siemens' sales to dealers and Patterson accounted for approximately 22%.

### Schein D.E.'s Mail Order Operation

Plaintiff Hayden is a dental equipment dealer, having its principal place of business in Great Neck, New York, and serving the metropolitan New York area. In 1979, Marvin Schein ("Schein") bought 50% of Hayden and, in 1980, he became its sole owner. Hayden, which sells various brands of dental equipment, had become a full-service dealer for Siemens in 1978. As such, Hayden not only sold Siemens' x-ray equipment, but it also assembled, installed, calibrated, and serviced that equipment and provided instructions on use to the dentists and dental staff.

After Schein bought Hayden, he founded Schein D.E. as a national mail order operation for the discount sale of dental equipment. Schein D.E., which also operates out of Great Neck, New York, sells most major brands of dental equipment. Through his control of Schein D.E. and Hayden, Schein began to sell Siemens' equipment by mail order.

As a mail order house, Schein D.E. has no sales force, service staff, or showroom. Although Schein D.E. does not assemble, install, calibrate or service the equipment it sells, it offers a toll-free number for dentists to use for their inquiries and also provides the names of independent service organizations in the dentist's area.[3] Given its low overhead costs, Schein D.E. is able to extend discount rates to its customers. For example, Schein D.E. sold Siemens' products for between 20–25% less than authorized, full-service dealers.

In 1981, Schein invited dental equipment manufacturers and suppliers to provide marketing information to him for inclusion in the first edition of his mail order catalog. The Schein D.E. catalog is arranged alphabetically and includes photographs, a brief description of the product, and pricing information. Dentists call Schein D.E.'s toll-free number for additional information and assistance. Schein D.E. personnel explain the different features offered by different types of dental x-ray equipment and sometimes make recommendations to dentists.

Every name brand of dental equipment agreed to appear in Schein D.E.'s first catalog, which reached over 50,000 dentists in 1982. Siemens either expressly approved its inclusion in this catalog, or, once aware of its inclusion, cooperated with Schein D.E. For example, Siemens authorized its warehouse to drop-ship dental equipment directly to Schein D.E.'s customers, who were outside the New York area that Hayden covered, rather than to Hayden directly, even though Hayden was technically the customer. Furthermore, a split commission was authorized between the Siemens representative for Hayden, Lee Mergentime, and the Siemens representative in the area to which Schein D.E. had made the sale.

### Siemens' Authorized Dealership Agreement

On April 25, 1983, David Vitt, Siemens' Vice President of the Dental Division in the

---

x-ray unit they install. Siemens provides follow-up calls on panoramic sales made by its full-service dealers. It seems clear that Siemens has made a substantial effort to ensure that the quality of service on its products is commensurate with the product itself.

3. Some of the independent service people that Schein D.E. recommends, and that dentists employ, are former or current employees of authorized service dealers, moonlighting on the side, who keep abreast of any changes or developments in Siemens' equipment by using the manual that Siemens is required by federal law to provide with its product. Schein D.E. takes no responsibility for the work performed by these independent service technicians. Dentists are not required to use the service organizations that Schein D.E. has recommended, nor are they required to inform Schein D.E. as to who performed the installation. Although Schein D.E. often attempts to ascertain the name of the installer selected by the dentist before selling the x-ray unit, it has no way of knowing whether or not the dentist uses that installer.

United States, wrote all Siemens dealers, including Hayden, reaffirming Siemens' policy that only authorized dealers and their agents sell and install Siemens' equipment. The letter further expressed Siemens' overall marketing and technical concerns, noting in pertinent part:

> You are and remain an authorized dealer for Siemens Dental Products because of your reputation as a full service dealer, capable of promoting, selling and installing Siemens Products, consistent with [the] quality associated with these Products and our trade name. Sales by you to third parties, including mail order houses, for redistribution are not allowed since Siemens has a legal obligation and a dedication to its good will to monitor sales and installation of its Products in a quality manner.

That same day, Vitt also wrote Schein and requested that he remove all Siemens products from the Schein D.E. catalog.

On May 3, 1983, Hayden expressed its willingness to comply with Siemens' policy. On August 4, however, Siemens sent Hayden a letter declaring that, due to repeated transgressions (even after its assurances to the contrary, it was discovered that Hayden had filled Schein D.E. orders in June and July), Siemens would no longer accept purchase orders from Hayden. Siemens continued to supply Hayden despite the August 4th ultimatum, because Hayden represented that Schein D.E. would forward leads to Hayden, which would then do all the selling. Hayden also provided further assurances that Siemens' equipment was being sold to dentists in the New York area, which Hayden legitimately covered,

when in fact it is clear that this was yet another Hayden misrepresentation.[4]

On August 30, 1983, Siemens sent to all of its dealers a uniform "Authorized Dealership Agreement" specifying what services and other requirements Siemens considered essential. Consistent with its 1975 "Marketing Program," the Agreement required Siemens dealers to maintain a qualified sales and service team capable of assisting customers in ordering, office design, financing, installation, and servicing. Siemens also insisted that its dealers stock spare parts, as well as installation and servicing tools, and that its dealers carry adequate products liability and risk insurance. Dealers signing the Agreement also obligated themselves to promote, install and service Siemens' equipment. The Authorized Dealership Agreement neither imposed any requirement with respect to dealers' pricing nor granted any dealer an exclusive territory. No reference was made directly to mail order sales.

All Siemens dealers except Hayden signed the Authorized Dealership Agreement, with only minor changes. Hayden refused to sign unless Siemens substantially altered the Agreement. Siemens and Hayden negotiated over a three-month period in an effort to reach an accommodation. On October 28, Schein wrote Siemens, advising that Schein D.E. was sensitive to Siemens' concerns and hoped something could be worked out.[5] By late November, Siemens had determined that further negotiations were futile, and Hayden was terminated. In January of 1984, plaintiffs brought this action.

---

**4.** The sales figures for that period betray Hayden's assertions. In 1981, Schein D.E. sold $58,-461.25 worth of Siemens equipment, while Hayden sold none. In 1982, Schein D.E. sold $347,-525.00 worth of Siemens equipment and Hayden sold only $9,268.00. Likewise, in 1983, Schein D.E. sold $336,285.00 worth of Siemens equipment that it had bought from Siemens through Hayden and Hayden itself sold $13,-365.00.

**5.** Schein's letter provided in pertinent part:

> We are prepared to work out accommodations with you to attempt to satisfy Siemens

[sic] expressed concerns on the following subjects among others:

(A) Siemens objection to any resale of its products other than to end users.

(B) Siemens desire to know in advance who will install its products and that these persons are so qualified.

(C) Siemens desire that dentists have a way of knowing that they can get products in their locations.

(D) Siemens concern that the dentist know the identity of the seller—H.L. Hayden Co.

(E) Any other concerns Siemens may have even if not listed here.

## II. Plaintiff's Causes of Action

Plaintiffs maintain that the 1983 Authorized Dealership Agreement was a transparent attempt by Siemens to eliminate Schein D.E. and mail order discounting. Of course, the policies underlying the Agreement ostensibly had been in place since institution of Siemens' "Marketing Program" in 1975.[6] Just why it had taken Siemens so long to enforce more vigorously the policy's requirements is central to this lawsuit. Plaintiffs maintain that the April 25 letter and resulting Authorized Dealership Agreement were the products of an illegal conspiracy between Siemens and its two largest full-service dealers, Healthco and Patterson, in violation of section 1 of the Sherman Act. Siemens replies that fear of legal action, such as the lawsuit it is now forced to defend, made management uneasy about more vigorously enforcing the 1975 policy, but that a management shake-up of its Dental Division and heightened sensitivity to the corrosive effect mail order discounting was having on the ability of its full-service dealers to compete finally dictated that events must change. Plaintiffs further allege that, in violation of section 2 of the Sherman Act, Healthco and Patterson have attempted to monopolize the dental equipment retail market. Thirdly, plaintiffs allege that Healthco and Patterson have received discriminatory price breaks from Siemens in violation of the Robinson-Patman Act which also were designed to undercut Schein D.E.'s market position. Various pendent state claims also are alleged.

### A. Sherman Act § 1: Conspiracy in Restraint of Trade

We view the section 1 claims as the core issues in dispute in this action.[7] We begin with the fundamental premise that section 1 requires a "contract, combination, ... or conspiracy, in restraint of trade." Generally, those contracts, combinations, or conspiracies that are formed to effectuate pricing restraints have long been considered per se illegal. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 404–09, 31 S.Ct. 376, 383–85, 55 L.Ed. 502 (1911).[8] Those that are created to ensure non-price restraints are treated under the rule of reason analysis. *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977). The existence of a "contract, combination, or conspiracy" is a necessary predicate to a section 1 claim.[9] Therefore,

---

**6.** Despite adoption of the "Marketing Program" in 1975, however, it is clear that on at least one occasion Hayden submitted a Siemens Heliodent (intraoral equipment) for warranty repair, even though the equipment, which had been sold by Schein D.E., was not under warranty. The equipment needed to be repaired because of faulty installation. To satisfy the customer, Siemens informed Schein that they were prepared to repair the equipment for a charge and shipping costs.

Until the commencement of this action, Schein D.E.'s catalogs indicated that manufacturer's warranties applied to the equipment. This Court granted a preliminary injunction prohibiting Schein D.E. from advertising that the Siemens equipment it sold through its catalog was covered by a Siemens warranty. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* No. 84 Civ. 0306 (S.D.N.Y. June 21, 1984) (mem. decision). Before the injunction issued, sixty-four dentists who had purchased Siemens equipment from Schein D.E. nevertheless mailed manufacturer's warranty cards to Siemens. Schein D.E. now supplies its own warranty for Siemens equipment.

**7.** Indeed, plaintiffs' voluminous and sometimes rambling brief in opposition to the various motions devotes over three-quarters of its 404 pages (excluding tables of contents and authorities, and other various references) to the section 1 claims. We suggest that represents an accurate breakdown of the true substance to the various claims asserted by plaintiffs, and we intend to follow a similar structure with respect to this opinion.

**8.** We recognize that there is considerable debate amongst the various schools of thought as to the continuing wisdom of retaining a per se standard in all pricing cases. The rule, however, has proven resilient. It has weathered, for now at least, this torrent of intellectual criticism and remains intact. *See Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761–62 n. 7, 104 S.Ct. 1464, 1469–70 n. 7, 79 L.Ed.2d 775 (1984) (expressly declining to reject per se rule in pricing cases despite importuning by Justice Department, as amicus, to the contrary). We, of course, intimate no preference in this debate.

**9.** Plaintiffs actually have asserted the existence of three separate section 1 conspiracies: a vertical conspiracy between the manufacturer, Siemens, and two of its distributors, Healthco and Patterson; a horizontal conspiracy between

we need not concern ourselves with the pricing/nonpricing distinction if an illegal conspiracy is not proved.[10] Thus, on a motion for summary judgment, establishing the basis for inferring a conspiracy is a threshold issue.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the moving party to demonstrate the absence of a material, factual dispute. Fed.R. Civ.P. 56(e); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In a section 1 case, given the threshold nature of the conspiracy question, the moving party, in this case the defendants, must show that the facts alleging a conspiracy are "not susceptible

of the interpretation" plaintiffs set forth in their complaint. *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

If that burden is met, the non-moving party, the plaintiffs in this case, cannot simply rest on their complaint setting forth a valid cause of action under section 1. Fed.R.Civ.P. 56(e); *Cities Service,* 391 U.S. at 289–90, 88 S.Ct. at 1592–93. More specifically, "[t]o survive [a] motion for summary judgment, [plaintiffs] must establish that there is a genuine issue of material fact as to whether [defendants] entered into an illegal conspiracy that caused [plaintiffs] to suffer a cognizable injury." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (footnote omitted).[11] *Accord Celotex Corp. v. Ca-*

Healthco and Patterson; and a horizontal conspiracy between Siemens and Healthco. We find considerable difficulty with the last characterization. Plaintiffs allege that because Healthco, in 1981, introduced its own intraoral x-ray equipment, the Lumix, Healthco and Siemens are competitors. Plaintiffs' brief devotes considerable space to the vertical/horizontal distinctions. We appreciate the significance of those distinctions, but we underscore the fact that whether or not a given section 1 claim involves vertical or horizontal restraints, it must first and foremost involve a "contract, combination, or conspiracy." Holding as we do that plaintiffs have not presented evidence sufficient to permit an inference of any conspiracy, vertical or horizontal, we need not address the characterization issue in depth.

We note, parenthetically, that the alleged vertical conspiracy clearly is the principal target of plaintiffs' complaint, and we focus our section 1 analysis accordingly. We are cognizant, however, of the horizontal claims as we proceed to a discussion of the facts, and we emphasize that we find insufficient evidence to infer the existence of *any* conspiracies, horizontal or vertical.

**10.** Just as plaintiffs devoted excessive argument to the horizontal/vertical distinction, *supra* note 9, they go on endlessly about the need to treat all of the alleged conspiracies under the per se rule. We recognize that a vertical resale price maintenance scheme between Siemens and its distributors would be per se illegal. *Monsanto Co. v. Spray-Rite Service Corp,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Likewise, we recognize that certain horizontal restraints are per se illegal. *See, e.g., Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (division of

markets); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930) (group boycotts). Again, however, plaintiffs have put the antitrust cart before the conspiratorial horse. Section 1 explicitly requires the existence of a "contract, combination, or conspiracy." If and only if a conspiracy is proved does the analysis shift to the characterization issue (i.e., is the conspiracy vertical or horizontal), and only after characterization does the analysis shift to a determination of the proper legal standard to be applied (per se or rule of reason). Holding as we do that plaintiffs have not presented evidence sufficient to infer existence of any conspiracy, we need not engage in a per se or rule of reason analysis.

**11.** Not only must plaintiffs show proof of a conspiracy, but they must also show that they suffered "cognizable injury" as a result of that conspiracy. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also infra* note 27 and accompanying text (discussing private plaintiff standing under antitrust laws). Holding as we do that plaintiffs have not met their prima facie burden of creating a reasonable inference of conspiracy, we need not address whether plaintiffs have suffered harm flowing from that conspiracy. We note, however, that in the years since Siemens terminated Hayden, Schein D.E. continues to receive Siemens' equipment through dealers who "backdoor" the equipment to Schein D.E. (contrary to the supposed compliance of those dealers with Siemens' Authorized Dealership Agreement).

*trett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (summary judgment proper when nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). In addition, if plaintiffs are to clear the summary judgment hurdle, they must show that there is more than merely "some metaphysical doubt as to the material facts." *Matsushita,* 106 S.Ct. at 1356.[12]

Of course, direct evidence of a conspiracy is rarely available. Inferences ordinarily must be drawn and, at this stage, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). "[A]ntitrust law [, however,] limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita,* 106 S.Ct. at 1357. In delineating those limits, the *Matsushita* Court stated:

> Schein D.E. may pay higher prices for these backdoor Seimens products than it did when Siemens supplied plaintiffs directly, although Schein D.E.'s 1985 catalog shows Siemens' intraoral equipment (Heliodent) at a "super low" price of $2,875.00. Despite Siemens' efforts to police their dealers, Schein D.E.'s sales of Siemens' equipment were almost as great in 1985 as in 1983 (Hayden was terminated in November of 1983). A summary of Schein D.E.'s gross revenues attributable to Siemens sales for the period between 1982–1985 is instructive:
>
> > 1982 – $347,520
> > 1983 – $486,000
> > 1984 – $451,407
> > 1985 – $447,000
>
> Indeed, since Siemens terminated Hayden, Schein D.E.'s business has been robust. In 1984, its total sales increased 20% and its operating income increased 23.5%. Its total x-ray sales increased 37.5% and its total x-ray gross profit increased by 44%. In 1985, Schein D.E. offered seven brands of dental equipment: Belmont, Gendex, Ritter/Midwest, Philips, Wehmern, S.S. White, and Siemens. It chose not to include at least twelve other brands that are sold in the United States.

**12.** The *Matsushita* Court also held that if the alleged conspiracy is "implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita,*

Thus, in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.,* at 764 [104 S.Ct. at 1470]. See also *Cities Service,* [391 U.S.] at 280 [88 S.Ct. at 1588]. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. [*Monsanto,*] 465 U.S., at 764 [104 S.Ct. at 1471]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could have harmed respondents.

*Matsushita,* 106 S.Ct. at 1357. It is the *Monsanto* standard, as elucidated in *Matsushita,* which controls in the case at bar.[13]

106 S.Ct. at 1356. Unlike the predatory pricing scheme in *Matsushita,* however, the vertical or horizontal agreements alleged here are not implausible. If Healthco and Patterson could convince Siemens to terminate Hayden, thereby closing off Schein D.E.'s only source of Siemens' equipment, Schein D.E. would theoretically be dealt a crippling blow. Unlike a predatory pricing scheme, this type of agreement would not require that the conspirators endure long periods of lost or reduced profits, nor would the plan's ultimate success depend upon the garnering of monopoly profits, a scenario the *Matsushita* Court described as "by nature speculative ... [and] inherently uncertain." *Id.* at 1357. Given the plausibility of the alleged scheme(s) in this case, plaintiffs need not come forward with more persuasive evidence than would otherwise be necessary to survive defendants' summary judgment motion.

**13.** Plaintiffs argue that *Monsanto* is inapposite since that case involved an appeal from a directed verdict. We cannot agree. First, the standards for summary judgment and directed verdict "mirror" one another. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Second, and more important, the *Matsushita* Court expressly held that the *Monsanto* standard applied in both the summary judgment and directed verdict contexts. *Matsushita,* 106 S.Ct. at 1357 (cited in full above).

We note that the Second Circuit adhered to a *Monsanto*-like standard prior to the *Monsanto* Court's resolution of the split that existed in the circuits on this issue. *Schwimmer v. Sony Corp. of America*, 677 F.2d 946, 952–53 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982); *H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). In addition, this Circuit has been quick to embrace whatever refinements to the *Monsanto* standard were supplied by *Matsushita. Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252–53 (2d Cir.1987); *International Distrib. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793–95 (2d Cir.1987). In both *Apex Oil* and *International Distribution*, the court has made clear that, at a minimum, plaintiffs in the case at bar must show that the alleged "conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement" if a reasonable inference of conspiracy is to be drawn. *Apex Oil*, 822 F.2d at 252; *International Distribution*, 812 F.2d at 793 (both quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)).

On defendants' motion for summary judgment, then, the *Monsanto-Matsushita* standard requires a two-pronged inquiry. First, have defendants met their burden of establishing that there does not exist a sufficient basis for inferring a material fact, to wit, the existence of a conspiracy? If so, have plaintiffs then met their burden not only of showing that an illegal conspiracy could be inferred just as easily as not, but have they introduced evidence that "tends to exclude the possibility" of independent action? We turn now to the facts, first to defendants' evidence of independent action, and then to plaintiffs' evidence of conspiracy.

### 1. *Siemens' Independent Business Reasons for Terminating Hayden*

■ The defendants maintain that Siemens acted independently in terminating Hayden. In support of this argument, Siemens has offered several business concerns which it argues justify its decision, including a desire to prevent erosion of its marketing strategy, a desire to protect its reputation in the market, and a desire to guard against the pernicious effects of "free riding."

#### i. *Mail Order: Ineffective Marketing*

Siemens claims that the very concept of direct mail marketing for dental x-ray equipment is inconsistent with its "Mercedes"-quality product and detracts from its image.[14] Further, Siemens contends that it had chosen to implement and enforce a marketing strategy that presents a high-quality product complete with manufacturer's warranty and a full range of services. Schein D.E., on the other hand, because it was not a full-service dealer, could sell only an "unbundled" version of this product (i.e., without a manufacturer's warranty or services). Siemens argues, in essence, that the "unbundling" changed the nature of the product and was inconsistent with its stated marketing strategy. Thus, to the extent Hayden persisted in supplying Schein D.E. with Siemens' equipment, Hayden undermined Siemens' strategy of marketing a warranted product through intensive and direct pre-sale, point-of-sale and post-sale client contact.

#### ii. *Siemens' Reputation*

It is clear, and Siemens emphasizes, that assembly, installation, calibration and servicing affect the operating quality of the equipment. Thus, Siemens argues that enforcement of its policy to supply only full-service dealers was essential if it was to

---

**14.** Siemens has no quarrel with the professionalism of Schein D.E.'s mail order catalog, but rather with the notion that a picture of its product with a very brief description of the equipment is sufficient to convince a potential buyer of the need to spend more money for Siemens' quality product than for any of the other similarly advertised, but less expensive, products. Indeed, a former Hayden employee who worked in mail order sales, and who now works for Healthco, attested that dental equipment is too costly and complex to sell by mail order.

protect its reputation in the market.[15] Siemens feared that dentists who had purchased Schein D.E.'s unwarranted, "unbundled" version of Siemens' product would assume that problems resulting from installation by unauthorized individuals stemmed from some defect in Siemens' equipment.[16] It is only logical that with Siemens' name on their product, and no Schein D.E. service staff to turn to, dentists would look to Siemens for assistance with their service problems. Indeed, to protect its reputation, Siemens felt compelled initially to perform for Schein D.E. customers the very servicing tasks that Siemens, in 1975, had opted to leave to its authorized full-service dealers. *Supra* note 6. In light of these problems, Siemens resolved to emphasize and enforce its policy to sell its products only to those dealers able and willing to comply with Siemens' service policy.

Moreover, installation and service affect the safety of those using the equipment. Schein's pooh-poohing of this issue is without merit. The equipment is federally regulated, and Schein's attempt now to minimize the safety issue contrasts starkly with its earlier statements. After this Court, in June of 1984, enjoined Schein D.E. from falsely advertising that Siemens does not honor its warranty on dental equipment sold by Schein, Schein proposed the following disclaimer:

> *Note:* A warranty is provided by Schein Dental Equipment. A Siemens'

warranty is not provided. However, pursuant to the Radiation Control for Health and Safety Act of 1968 (42 U.S.C. §§ 263b–n), Siemens must guarantee through certification that its dental x-ray equipment complies with federal performance standards. Siemens remains responsible during the life of the equipment, at no cost to the purchaser, for repair, replacement or refund in cases where required by the Act.

Not only did we find that this proposed language violated our previous order, *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, No. 84 Civ. 0306, slip op. at 7 (S.D. N.Y. Jan. 10, 1985) (mem. decision) [Available on WESTLAW, DCT database], it also demonstrates Schein's clear understanding of safety problems related to installation and servicing of the equipment.

In sum, Siemens' position is that it acted to protect not only its reputation, but its vulnerability to future products liability actions.

### iii. "Free Rider" Effect

Siemens also was concerned because its full-service dealers who comply with the Authorized Dealership Agreement, and who provide pre-sale, sale, and post-sale services, are at an obvious competitive disadvantage. Siemens received numerous dealer complaints in 1982 and 1983 that dealers had lost sales to mail order after they had done the groundwork.[17] Al-

---

**15.** Siemens argues not that dealer service technicians make no errors, but that Siemens is able to train those technicians to be alert to certain potential problems and can then monitor their work and correct and prevent errors. (Plaintiffs include in their Appendix Exhibits several letters that Siemens wrote to authorized dealers about errors in installation.) It is for this very reason, to monitor and maintain control, that Siemens relies on an authorized dealership system. We note that Siemens instituted a rather substantial training and follow-up program for full-service technicians in an effort to help ensure quality control, discussed *supra* note 2.

Further, and worse, there is evidence that nontechnical personnel were working on Siemens' sophisticated equipment. Handwritten notations on some Schein D.E. invoices suggest that plumbers, electrical contractors, and dentists themselves were acting as installers.

**16.** That factor was a consideration (though not a major one) in this Court's order of June 21, 1984, restraining Schein D.E. from advertising that there is a manufacturer's warranty applicable to the Siemens' equipment it sold without authorized installation.

**17.** Siemens offers one account (from a weekly Call Report of a Siemens sales representative for August 6, 1983) of one dealer who permitted a dentist (Dr. Bird) to use a Siemens unit for 30 days. Dr. Bird then bought the unit from Schein D.E. and Hayden, which sold the unit in Tulsa, Oklahoma on August 8, 1983. We note, parenthetically, that this purchase occurred after Hayden had given several assurances to Siemens that it would comply with the Authorized Dealership Agreement and not supply Schein D.E. with Siemens' equipment.

though plaintiffs dispute that Schein D.E. is a "free rider," they offer no support for these conclusory statements. On the contrary, a former employee of Hayden, who worked in mail order sales, stated that it was understood that dentists would look to full-service dealers to provide services that Schein D.E. does not, and that Schein D.E.'s employees encouraged customers to visit dealer showrooms.

Hayden complains that somehow it is being singled out for unfair and illegal treatment. Hayden was the only Siemens distributor owned by the owner of a mail order house. Further, until terminated, Hayden was supplying all of the Siemens product that Schein D.E. sold. It is clear that if this practice continued unchecked, Siemens' marketing strategy potentially would be seriously undermined. We find Siemens' concern of "free riding" to be real and legitimate. *See O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1468 (9th Cir.1986) (holding manufacturer's concern for "free rider" effect sufficient to meet his burden, as moving party under Rule 56, of showing independent conduct).

Not only are the various business justifications cited by Siemens typical in a case involving a manufacturer's refusal to deal, but, taken together, they are manifestly reasonable and sufficient to meet defendants' burden under Rule 56. In discussing the reasonableness of certain vertical restraints, like the Authorized Dealership Agreement at issue in the case at bar, the Supreme Court has noted:

> Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products.... The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called "free rider"

effect, those services might not be provided by retailers in a purely competitive situation....

*GTE Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560. We find that a reasonable jury would consider Siemens' business justifications to be convincing and sufficient to rebut plaintiffs' allegations of conspiracy. Moreover, as long as Siemens independently arrived at these reasons, even if Siemens' business judgments were wrong, inaccurate, or pretextural, "whether because of a desire to avoid controversy or some other consideration, this would not violate any legal obligation to the customer, absent proof of a conspiracy." *H.L. Moore*, 662 F.2d at 941. Irrespective of the underlying motives, unilateral conduct, whatever else it may be, does not constitute a violation of section 1. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

### 2. Plaintiffs' Evidence of Concerted Action

With defendants having met their burden of showing that the facts are "not susceptible of the interpretation" alleged by plaintiffs, *Cities Service*, 391 U.S. at 289, 88 S.Ct. at 1593, the burden now shifts to plaintiffs, who "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 106 S.Ct. at 1357 (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471).

Plaintiffs' theory is straightforward enough. Siemens, Healthco and Patterson, together vertically or in horizontal combinations thereof, allegedly conspired to drive Schein D.E. from the market. To achieve that goal, the plan purportedly focused on terminating Hayden as a distributor, thereby eliminating Schein D.E.'s only source of Siemens' equipment. By choking off its supply, defendants might strangle Schein D.E., ultimately eliminate mail order discounting,[18] and thereby maintain resale

---

**18.** We note that Schein D.E. is not the only mail order organization to provide interbrand competition. D.L. Saslow Co. also offers Belmont, Gendex, Phillips, and Ritter–Midwest brand x-ray equipment in its nationally-distributed mail order catalog, and there are eight other dealers who sell by mail order. No other dental equipment company, however, sells solely by mail

prices at a level that would continue to allow dealers to provide customers with a full range of services. The Authorized Dealership Agreement accomplished that purpose, plaintiffs contend, by imposing conditions on Hayden with which it could not possibly comply (mainly, the de facto prohibition on dealing with mail order houses).

■ At its core, plaintiffs case centers on complaints registered with Siemens by its full-service dealers, including Healthco and Patterson, that something had to be done about mail order discounting. There is no dispute on this point. Indeed, Siemens concedes that its desire to guard against "free riding," discussed *supra,* served as a principal motivation for enforcement of the Authorized Dealership Agreement. It is well-established, however, that dealer complaints, standing alone, are insufficient to justify an inference of an illegal section 1 conspiracy. *Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470. This Circuit, even prior to *Monsanto,* adhered to the rule that evidence of complaints alone will not satisfy plaintiff's burden on a Rule 56 motion in a section 1 case. *H.L. Moore,* 662 F.2d at 941. The policies underlying this rule should be obvious. Not only is it inevitable that a certain amount of information-sharing will exist between a manufacturer and its distributors, but that give-and-take is essential if a manufacturer is to maintain both its sensitivity to market conditions and its competitive edge. Judicial construction of a fictitious "Chinese wall" preventing communication between manufacturers and distributors would not only be virtually impossible to police, but it would be economically counterproductive to enforce. *See Monsanto,* 465 U.S. at 763–64, 104 S.Ct. at 1470–71 (discussing this issue).

Thus, something more than dealer complaints are needed if plaintiffs are to survive this motion for summary judgment. At a minimum, as noted earlier, plaintiffs must show that defendants had a "unity of purpose," a "common design or understanding," or a "meeting of the minds."

*Apex Oil,* 822 F.2d at 252; *International Distribution,* 812 F.2d at 793.

Cognizant of this burden, plaintiffs have woven a fact pattern laced with conspiratorial innuendo. Plaintiffs mark the American Dental Association's October 1982 annual convention in Las Vegas as the starting point in the conspiracy. There is some evidence that Siemens' Vitt told full-service dealers during a private meeting at that convention that he was "working on" the problem of mail order. That mail order was a problem for Siemens is conceded by Siemens itself, and the fact that Vitt would be "working on" one of Siemens' problems is hardly a conspiratorial revelation. *See O.S.C.,* 792 F.2d at 1494–95 (holding manufacturer's promise that "something was going to be done about price erosion" insufficient to raise inference of conspiracy).

Plaintiffs also note that, not surprisingly, there was a private meeting at this convention between executives of Healthco, Patterson, and D.L. Saslow Co., the third major chain. Plaintiffs allege that there was a conspiratorial discussion between these executives about eliminating a pharmaceutical company, but that is irrelevant to this action. Either at this meeting or at other similar gatherings, plaintiffs argue that because mail order was a "hot topic," the defendants "must" have discussed methods to ensure its demise. Plaintiffs offer no evidence to support this bare allegation.

Plaintiffs contend further that following the October meeting, Healthco and Patterson increased the pressure on Siemens to address the mail order problem. They cite letters between Siemens, its parent company, Siemens AG, and Healthco, which contain what plaintiffs characterize as veiled language meant to convey a boycott threat by the dealers as well as an invitation to conspire. Dealers refused to make routine follow-up calls on dentists who had bought their equipment from Schein D.E. or made such calls only after receiving repeated requests from Vitt, Schein, and the dentist. Dealers can and do tell potential clients

order, reaches such a large clientele, or produces a catalog of the same high quality.

that they won't receive follow-up calls if they use mail order.

Siemens concedes that it had received dealer complaints about mail order shortly after Schein D.E. entered the market in 1981, as well as after the 1982 Las Vegas convention. Indeed, Siemens' Vitt called and then met with Schein in June of 1982, urging that he raise prices. It appears Vitt also conveyed to Schein the impression that dealers were pressuring him and that M. Myer Cyker, President of Healthco, in particular had asked whether Siemens was giving Schein D.E. a preferential discount to enable Schein to sell at such low prices. Even if these facts are assumed to be true, little support is lent to plaintiffs' case. First, not only are dealer complaints insufficient, standing alone, to raise an inference of conspiracy, but a manufacturer's actions *"in response to"* such complaints are also insufficient. *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470 (emphasis added). Unilateral action, even if it is in response to dealer complaints, does not constitute a section 1 violation. *Colgate*, 250 U.S. at 307, 39 S.Ct. at 468. There must be evidence of a meeting of the minds, *Apex*, 822 F.2d at 252, and the Vitt-Schein meeting offers no support for that conclusion. Furthermore, as to the request to Schein to raise his prices, Schein alleges no further incidents or follow-up requests and no threats to terminate. Siemens continued to supply Schein D.E. through Hayden at that time and for some sixteen months thereafter.

Plaintiffs next point to the February 1983 meeting of the Dental Dealers of America, Inc. and the Dental Manufacturers of America, Inc. in Chicago. Healthco's Cyker addressed that convention. In his speech, Cyker offered to share with other dealers exhibits which warned dentists that *"it costs you more* to buy your equipment from mail order than from a Healthco dealer." (Emphasis in originals.) Further on, Cyker blasted the industry's manufacturers, alleging that they were "going all out with the mail order discounters, undercutting the dealers who are out doing their missionary work for them, solving problems for them in the field." Al-

though Cyker's speech clearly reflects a profound disgruntlement amongst the industry's full-service dealers with mail order discounting, the court has strained to find the conspiratorial overtones but finds none.

Plaintiffs also note that at some time during the Chicago convention, Siemens' Vitt and Peter Frechette, Patterson's President, met for lunch, a meeting laden with conspiratorial inferences according to plaintiffs. The depositions reveal that Vitt and Frechette did discuss Patterson's philosophies concerning distribution in the industry, but that evidence hardly transforms a legitimate business lunch between a supplier and a major distributor into a conspiratorial summit. After the Chicago meeting, Vitt corresponded with Frechette, writing that "[i]t was really good to get to know you and to hear about your philosophies concerning the distribution in the industry." He then reassured Frechette that, "[a]s I mentioned, I will do everything in our power to offer to you the best possible market environment." We find plaintiffs' conclusion that this letter is evidence of a conspiracy to be fraught with speculation.

Plaintiffs also make much of a Vitt meeting with a Healthco executive in Atlanta during a March 1983 industry gathering. Plaintiffs conclude that conspiratorial discussions directed toward Schein D.E.'s elimination "must" have taken place. This assumption is based presumably on the temporal proximity of the meeting with Siemens' actions one month later notifying its dealers of its renewed commitment to an authorized dealership program. It certainly is not based on any evidence that was presented to this court.

Plaintiffs also contend that there existed a quid pro quo arrangement between Siemens and Healthco. Plaintiffs maintain that Healthco's promotion of the Lumix, its in-house x-ray equipment, had cut into Siemens' market share. Siemens, supposedly, agreed to eliminate Hayden in return for increased efforts by Healthco to promote Siemens' equipment. After several months of declining sales in Siemens' equipment, plaintiffs note that Healthco showed an increase in those sales in March of 1983,

just one month before Siemens sent out its letter reaffirming its authorized dealer policy. In response to this speculation, Siemens notes that Healthco had stopped paying its bill in early 1983, and that Siemens ultimately cut off deliveries to Healthco in March of that year. Plaintiffs interpret these actions as being indicative of collusion. Siemens argues that, on the contrary, these decisions demonstrate a lack of cooperation between Healthco and Siemens. We agree.

Finally, plaintiffs rely on an April 5, 1983 internal report issued by a Siemens technical representative. In that report, the Siemens representative relays that he was advised by a full-service dealer that dealers intended to "support totally" and "work with" two manufacturers of certain non-x-ray equipment who had decided to remove their products from the Schein D.E. catalog. The dealer's comments are hardly surprising, and are not evidence of conspiracy. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923–24 (2d Cir.1985) (distributor's speech noting he would cease dealing with manufacturers who supplied discounters, even if known to manufacturer, was couched in generalities and inadequate to show conspiracy).

The sheer number of implausible conclusions set forth by plaintiffs does not overcome their implausibility or their conclusory nature. After struggling to find a clear direction in this labyrinthian mosaic, it should seem obvious that, to sustain plaintiffs' allegations of conspiracy, we are required to do more than draw all reasonable inferences in the plaintiffs' behalf. We must make grand leaps of faith. We are not willing to engage in such intellectual gymnastics. Rather, we must pierce through these sham allegations and speculative assertions if the *Monsanto-Matsu-*

*shita* standard is to retain its vitality. In fact, we find *Monsanto* particularly instructive in highlighting the shortcomings of plaintiffs' case.

Much like the case at bar, *Monsanto* involved a manufacturer's refusal to deal with a discount dealer. Unlike the case at bar, however, the *Monsanto* plaintiff was able to present not only complaints but other evidence of a conspiracy. In particular, there was direct evidence that the manufacturer used its muscle to extract minimum resale prices from its dealers, and a distributor newsletter was offered that included a blatant reference to the manufacturer's agreement to maintain resale prices at its company-owned outlets. *Monsanto,* 465 U.S. at 765–66, 104 S.Ct. at 1471–72.[19]

Beyond *Monsanto,* we are struck by the uncanny similarities between the case at bar and *Reborn Enter., Inc. v. Fine Child, Inc.,* 590 F.Supp. 1423 (S.D.N.Y.1984), *aff'd per curiam,* 754 F.2d 1072 (2d Cir.1985), one of the leading post-*Monsanto* cases in this Circuit involving the grant of summary judgment in a section 1 case. As here, *Reborn* involved a hodge-podge of alleged horizontal and vertical section 1 conspiracies. The defendant manufactured a high-quality baby stroller. Just as Siemens views its x-ray equipment as the "Mercedes" of its field, so the *Reborn* defendant apparently viewed its product as the "Rolls Royce" of baby strollers. *Id.* at 1430. For some time, the defendant had been concerned about doing business with a discounter who, like Schein D.E., did not offer follow-up repair service. The defendant, like Siemens, had long expressed concern that dealing with the discounter did not comport with its overall marketing strategy. In addition, the *Reborn* manufacturer received numerous complaints from its non-discount retailers, and even asked the dis-

---

**19.** The newsletter was far more susceptible to an inference of conspiracy than is plaintiffs' reliance here on the assurance of Siemens' Vitt to Patterson's Frechette that, "I will do everything in our power to offer to you the best possible market environment." As discussed *supra,* a manufacturer's concern for a market that is conducive to allowing full-service dealers to flourish, particularly as that concern relates to

"free riding," is thoroughly legitimate and permissible. The newsletter at issue in *Monsanto,* however, contained an explicit reference to an apparent agreement by the manufacturer to maintain artificially resale prices at its company-owned retail stores so that those stores would not undercut competing retailers. *Monsanto,* 465 U.S. at 766, 104 S.Ct. at 1472.

counter to adhere to a higher retail price list (akin to the Vitt-Schein meeting in June of 1982). Finally, after a change in management (just as there was a change in management at Siemens), the discounter was terminated. Beyond evidence of complaints, the discounter had patched together a quilt of speculation to support its section 1 claims. Just as the *Reborn* court found summary judgment proper in that case, *id.* at 1451, we find it proper here.

■ We are assured that Rule 56, whatever its prior status in this Circuit, is not a paper tiger, *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), and its use even in a complex antitrust case should not be discouraged. *Apex Oil*, 822 F.2d at 252. We do not believe that plaintiffs have met their burden under *Monsanto-Matsushita* of introducing sufficient evidence that "tends to exclude the possibility" of independent conduct. Other than dealer complaints, the only "evidence" of a conspiracy, horizontal or vertical, is mere speculation and conjecture, and that will not suffice. *See Matsushita*, 106 S.Ct. at 1357 (purely equivocal evidence does not give rise to an inference of conspiracy); *International Distribution*, 812 F.2d at 795 (quoting *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 80 (2d Cir.1980)) (plaintiff's conclusions require "impermissible speculation" and "lack factual foundation"); *Knight*, 804 F.2d at 12 (relying on *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985)) (party may not rely on speculation to overcome summary judgment motion). We are mindful of the fact that summary judgment "should not be regarded as a substitute for trial," *Apex Oil*, 822 F.2d at 252, but we believe there is no room for doubt on this issue. Defendants' motions for summary judgment on the section 1 claims are granted.

### B. *Sherman Act § 2: Attempt and Conspiracy to Monopolize*

We turn now to the perfunctory add-on in a section 1 refusal-to-deal case: a section 2 claim(s) against competitors of the terminated party. Section 2 of the Sherman Act prohibits monopolizing, attempting to monopolize, or conspiring to monopolize any part of interstate trade. 15 U.S.C. § 2. Plaintiffs allege that Healthco and Patterson, by seeking Hayden's termination and Schein D.E.'s isolation, are attempting to monopolize the retail dental equipment industry. Alternatively, plaintiffs argue that Healthco and Patterson somehow have conspired to monopolize the industry. We consider the charges in turn.

### 1. *Attempt to Monopolize*

■ An attempt to monopolize claim requires (1) a specific intent to monopolize, *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953), and (2) a "dangerous probability" of success. *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). *Accord, Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980). Plaintiffs offer no substantive evidence, direct or circumstantial, which would lead to the reasonable inference that either Healthco or Patterson harbor the intent necessary to support a section 2 claim. In addition, even if specific intent could be inferred, it is demonstrably clear that neither defendant possesses the requisite market power to suggest a dangerous probability that either could assume a monopoly position in the market. The rationale underlying the dangerous probability requirement is obvious. Most businesses would like to rise to a dominant monopoly position in their market. Very few succeed. Simply having the desire without the capability poses no threat to the goals of antitrust. As the Supreme Court has noted, "The antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*.' " *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)) (emphasis in original).

The relevant market is a national one, involving the retail sale of dental equipment. Defendant Healthco, which has its principal office in Boston, Massachusetts,

owns the largest national chain of full-service retail dental equipment dealerships. Defendant Patterson, which has its principal place of business in Minneapolis, Minnesota, owns the second-largest national chain. Between them in 1981, they had over 170 store locations, with Healthco owning 90 and Patterson owning 87. In 1982, Healthco had 96 locations and Patterson 88. Neither distributor, however, independently has sufficient market power to justify the conclusion that market power, if exercised with monopolistic intent, could result in monopoly. In 1981, for example, there were a total of 303 dealer companies nationwide with 619 locations. Construing the available evidence in the light most favorable to the plaintiff, each defendant has, at a maximum, approximately 20% of the dental equipment market.

There is no hard and fast rule as to what market percentage is sufficient to constitute a dangerous probability of success. Perhaps the leading case on attempted monopolization in this Circuit has found that a one-third market share was too low to infer a dangerous probability of success. *Nifty Foods*, 614 F.2d at 841. In *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649, 665 (S.D.N.Y.1980), *aff'd*, 697 F.2d 495 (2d Cir.1983) (per curiam), the one-third share of the market held by each of the three major television networks was found as a matter of law to be inadequate to establish such a dangerous probability that any one of the defendants would succeed in monopolizing the relevant market.[20] We find that the 20% shares held by each of the defendants in the case at bar are insufficient to justify an inference that there is a dangerous probability that either, even if they possess the requisite specific intent, are likely to achieve monopoly power.

■ Apparently recognizing the vulnerability of their section 2 claim, plaintiffs argue that the *combined* Healthco/Patterson market share approaches fifty percent, and that the 50% aggregate meets the dangerous probability threshold. Leaving aside the fact that twenty and twenty do not equal fifty, there is no authority for accumulating market shares in a section 2 attempt case. In *Levitch*, the defendants, the three major television networks, cumulatively had the *entire* market, but that never was mentioned as a material consideration in the decision. *Levitch*, 495 F.Supp. at 665. The concept of combining market shares also was rejected by Judge Lasker in *Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.*, 535 F.Supp. 225, 228–29 (S.D.N.Y. 1982) (emphasis in original), where he held:

> [Plaintiff's] allegations that [defendants] account for between 98 and 100 percent of the market assumes that the defendants' *combined* market power is the relevant datum. That approach, however, might be termed tautological.... Rather, in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant.

The section 2 offense of attempted monopolization is directed at unilateral conduct, and plaintiffs' theory of combining market shares must fail for that reason.

## 2. Conspiracy to Monopolize

■ Alternatively, plaintiffs allege that Healthco and Patterson conspired to monopolize the dental equipment retail market in violation of section 2. We note from the outset our considerable discomfort with this claim.[21] The notion that two *competitors* could conspire to monopolize is, seem-

---

**20.** The 8th Circuit has found that even a fifty percent market share was insufficient. *United States v. Empire Gas Corp.*, 537 F.2d 296, 305–07 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

**21.** Any section 2 conspiracy to monopolize must be covered under the broader umbrella of a section 1 conspiracy in restraint of trade. The inverse, of course, would not necessarily follow. Professors Areeda and Turner have noted, "The [section 2 conspiracy] prohibition is curious, because, given § 1, it seems entirely redundant." 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 839, at 358 (1978). Although we are unwilling to ascribe redundancy to Congress's action, especially in light of the insufficient briefing of this issue in the case at bar, we agree with Professors Areeda and Turner that the provision is, at a minimum, "curious."

ingly, antithetical. Two competitors could conspire to oligopolize, which would constitute an illegal section 1 conspiracy in restraint of trade, but it would not constitute an offense under a literal reading of section 2. Despite our misgivings, the leading Supreme Court case involving a section 2 conspiracy concerned the combination of horizontal competitors. *American Tobacco*, 328 U.S. at 783, 66 S.Ct. at 1126 (defendants, convicted of a section 2 conspiracy, comprised the three major tobacco companies). In granting certiorari, however, the Court limited its review to whether the exclusion of competitors is a necessary element of monopolizing under section 2. *Id.* at 784, 66 S.Ct. at 1126–27. The discreet question of *who* must combine to constitute a conspiracy under section 2 was not squarely addressed by the Court in *American Tobacco* or, apparently, in any other case to date.[22] *Cf. Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708–09, 82 S.Ct. 1404, 1415–16, 8 L.Ed.2d 777 (1962) (holding jury charge of conspiracy monopoly between competitors did not preclude charge as to unilateral monopoly, but no suggestion that conspiracy charge itself, as between competitors, was inappropriate). That singular issue, and section 2 conspiracies generally, appear to have received scant attention from the courts and commentators. 2 E. Kintner, *Federal Antitrust Law* § 14.1, at 433–34 (1980). *See generally id.* §§ 14.-1–14.7 (discussing conspiracy to monopolize); 3 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 839–62 (1978) (discussing applicability of section 2 in shared monopoly context and suggesting limits on its extension in private antitrust actions).

In addition, there is not universal agreement on the legal standards to be applied in a section 2 conspiracy case. The principal issue in dispute between the circuits is whether a dangerous probability of success is required of a section 2 conspiracy, as it is of a section 2 attempt offense. There have been conflicting decisions on the matter in this Circuit, although the most recent decision to address the issue has held that dangerous probability is *not* a requirement for establishing a section 2 conspiracy. *International Distribution*, 812 F.2d at 795 n. 8. That decision states the section 2 conspiracy standard for this Circuit thusly: "The elements of a conspiracy to monopolize are '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'" *Id.* at 795 (quoting *Paralegal Inst., Inc. v. American Bar Ass'n*, 475 F.Supp. 1123, 1132 (E.D.N.Y.1979), *aff'd.* 622 F.2d 575 (2d Cir.1980) (mem. decision)). Plaintiffs focus on this standard, and the fact that dangerous probability of success is not required, as all-important. That focus is misplaced.

■ We find that plaintiffs' section 2 conspiracy claim fails for at least two reasons. First, whatever the proper legal standard, it is clear that "§§ 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap." *American Tobacco*, 328 U.S. at 788, 66 S.Ct. at 1129. When the costume is stripped away, plaintiffs' claim is really their section 1 charge against Healthco and Patterson masquerading under the guise of

---

22. Professors Areeda and Turner cite, in addition to *American Tobacco*, three cases from which they draw support for their conclusion that competitors can conspire to monopolize in violation of section 2. 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 841 nn. 2–4 (1978). Those cases, however, although arguably involving horizontal competitors, were not pursued under section 2. *See Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 595, 71 S.Ct. 971, 973, 95 L.Ed. 1199 (1951) (claims under section 1 and 3 of Sherman Act); *FTC v. Cement Inst.*, 333 U.S. 683, 688, 68 S.Ct. 793, 797, 92 L.Ed. 1010 (1948) (claims under section 5 of Federal Trade Commission Act and section 2 of Robinson–Patman Act); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 165–66, 60 S.Ct. 811, 818–19, 84 L.Ed. 1129 (1940) (claim under section 1 of Sherman Act). In fact, *Socony–Vacuum*, a horizontal conspiracy prosecuted by the government under section 1, merely adds to our "curiosity" as to the appropriateness of finding horizontal conspiracies to monopolize under section 2.

section 2.[23] As such, it does not meet the *American Tobacco* requirement of "reciprocal distinguishability."

■ Second, it is clear both from the language of section 2 and from the *International Distribution* Court's interpretation of it that, like section 1, the existence of a conspiracy is a threshold issue in a section 2 conspiracy claim. Plaintiffs offer no additional facts of substance to support their assertion that a section 2 conspiracy exists.[24] They rely on the same speculation and conjecture that proved fatal to their section 1 conspiracy claims, and it is no less subversive here.

Defendants' motion for summary judgment on each of the section 2 claims is granted.

## C. Robinson-Patman Act: The Price Discrimination Claims

■ One of the principal motivations behind passage of the Robinson-Patman Act in 1936 was the inability of the Clayton Act to protect small businesses in "secondary line" cases, such as here, where large "chain store" buyers are theoretically able to extract or receive price differentials from suppliers due to their ability to sell large volumes of goods. *FTC v. Morton Salt Co.*, 334 U.S. 37, 49, 68 S.Ct. 822, 829, 92 L.Ed. 1196 (1948). *See also* 3 E. Kintner & J. Bauer, *Federal Antitrust Law* §§ 19.1 & 19.2 (1983) (reviewing history of Robinson-Patman Act). Robinson-Patman was designed to level the playing field and ensure that success in the market was based on business acumen and skill rather than on discriminatory breaks derived from the belief that bigger was necessarily better. Despite controversy surrounding the law's application in the fifty years since its enactment, it remains essentially intact.

Plaintiffs' third cause of action asserts various violations of section 2 of the Clayton Act, as amended by the Robinson-Patman Act (codified as amended at 15 U.S.C. § 13). Plaintiffs maintain that Siemens provided Healthco and Patterson with price breaks not available to other purchasers in violation of section 2(a). Plaintiffs further allege that Siemens provided Healthco and Patterson with commissions or brokerage fees in violation of section 2(c), and discriminatorily furnished services or facilities in violation of section 2(e). Finally, plaintiffs contend that Healthco and Patterson either knew of or induced the price discrimination in violation of section 2(f). Plaintiffs seek treble damages for injuries allegedly caused by these violations pursuant to section 4 of the Clayton Act (codified as amended at 15 U.S.C. § 15).[25]

23. The second cause of action set forth in the complaint makes explicit reference only to attempt, not conspiracy. Plaintiffs argue that the conspiracy charge is made out because they reallege facts recited under the section 1 conspiracy charge. This merely buttresses our conclusion that a separate conspiracy has not been alleged. For example, paragraph 39 of the complaint, realleged for the section 2 claim and stating that Healthco and Patterson have conspired "to exert pressure on manufacturers of dental equipment to eliminate sales by manufacturers to mail order dealers," makes the point.

24. Plaintiffs do argue that a lunch between the store managers for Healthco's and Patterson's respective outlets in Tampa, Florida constitutes evidence of conspiracy. Plaintiffs assume that they must have discussed Schein D.E. and how to respond to its competitive challenge. The two store managers deny having had such a discussion. Even if they did, discussions of store managers hardly set corporate policy. While the plaintiffs have submitted hundreds of pages of briefs and thousands of pages of exhib-

its, none of this contains any hard evidence of a conspiracy between the parties to monopolize.

25. We must note in passing that there is a substantial inconsistency between plaintiffs' Robinson–Patman claims and the Sherman Act claims. (Although a party is allowed to plead inconsistently, it cannot sustain opposition to a motion for summary judgment by straddling inconsistent factual assertions.) The premise of the Sherman Act claims is that Schein D.E.'s mail order operation is creating consternation in the dental equipment industry by offering low prices with which the others cannot compete and it, therefore, is being retaliated against. This third cause of action for violations of Robinson–Patman can survive as a matter of law only if Healthco and Patterson are undercutting Schein D.E. with lower retail prices than those given by Schein D.E. and, in addition, that these more favorable prices are made possible by the manufacturer discriminatorily cutting its wholesale price to them. Interestingly, however, the defendants' papers contain statements by Schein (in a taped conversation which he himself re-

There is considerable question as to whether plaintiffs have made out a prima facie claim under any of the asserted sections of Robinson-Patman.[26] We need not, however, reach this issue. Instead, we find that plaintiffs do not have standing to bring a Robinson-Patman claim for damages under section 4 of the Clayton Act.

The Supreme Court has made clear that when a private party sues for treble damages under section 4, it must show, in addition to a Robinson-Patman violation, "*actual injury* attributable to something the antitrust laws were designed to protect." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981) (emphasis added).[27] Thus, "even if there has been a violation of the Robinson-Patman Act, [the plaintiff] is not excused from its burden of proving antitrust injury and damages." *Id.* at 568, 101 S.Ct. at 1930. The plaintiffs need not prove that the alleged violations were the sole cause of injury, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969), but they must show *some* actual injury with a causal nexus to the alleged violations. *Uniroyal, Inc. v. Jetco Auto Service, Inc.*, 461 F.Supp. 350, 356 (S.D.N.Y.1978) (citing *Jacobi v. Bache & Co.*, 377 F.Supp. 86, 93 (S.D.N.Y.1974), *aff'd*, 520 F.2d 1231 (2d Cir.1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 784, 46

---

corded) in which he brags to a major equipment manufacturer that *he* is able to put *Patterson* out of business.

**26.** For example, plaintiffs attempt to prove their section 2(a) price discrimination claim in a roundabout and unacceptable way. They direct attention to sales made by Patterson and Healthco at prices which they claim were allegedly less than Schein D.E.'s price would have been if Schein's prices were increased by an imputed installation charge. Imputing this installation charge creates an uncertainty as to whether in fact the Healthco or Patterson prices were actually lower than Schein D.E.'s.

**27.** Plaintiffs' brief, at points, confuses the distinction between the showing of injury to competition necessary to establish a prima facie case under section 2(a) of the Robinson–Patman Act with the showing of actual injury to the individual competitor necessary to confer standing under section 4 of the Clayton Act. The distinction *is difficult, given the overlap between the two, but essential.* Under section 2(a), in addition to other jurisdictional requirements, a plaintiff must show that "the affect of [the alleged price] discrimination may be substantially to lessen competition." There has been some dispute as to whether a "reasonable possibility" or "reasonable probability" of injury to competition is sufficient to make out a prima facie case under section 2(a). In *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945), the Supreme Court invoked both a "probability" standard, *id.* at 738, 65 S.Ct. at 967, and a "reasonable possibility" standard. *Id.* at 742, 65 S.Ct. at 969. Three years later, the Court, relying on *Corn Products*, said that a showing of "reasonable possibility" was sufficient. *FTC v. Morton Salt Co.*, 334 U.S. 37, 46, 68 S.Ct. 822, 828, 92 L.Ed. 1196 (1948). This Circuit has long adhered to a "substantial probability" standard. *Standard Motor Products, Inc. v. FTC*, 265 F.2d 674, 676 (2d Cir.1959). As plaintiffs correctly note in their brief, the

Supreme Court, apparently in an effort to resolve any confusion that exists on this issue, recently reaffirmed its supposed fidelity to the "reasonable possibility" standard. *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). It is unclear whether *Falls City* will cause this Circuit to rethink its position, but it is immaterial for the case at bar.

Making out a prima facie case under section 2(a) is separate and distinct from showing the requisite "actual injury" to an aggrieved competitor(s) under section 4. The *Truett* Court, in a passage plaintiffs cite for the wrong proposition in their brief, makes the distinction clear:

> By its terms § 2(a) is a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination *may be* substantially to lessen competition." (Emphasis supplied.) As our cases have recognized, the statute does not "require that the discriminations must in fact have harmed competition." *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 742 [65 S.Ct. 961, 969, 89 L.Ed. 1320] (1945); *FTC v. Morton Salt Co.*, [334 U.S.] at 46 [68 S.Ct. at 828] ("the statute does not require the Commission to find that injury has resulted"). Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to "[a]ny person who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws...." (Emphasis supplied.) To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). Holding as we do that plaintiffs have not suffered actual injury caused by any alleged Robinson–Patman violation, we need not decide whether a section 2(a) prima facie case has been made out.

L.Ed.2d 642 (1976)). Plaintiffs have not met this burden.

Overall, it is apparent that, even assuming price discrimination, the alleged violations have not affected Schein D.E.'s generally "robust" economic health. *Supra* note 11. More particularly, there are only three cases in which plaintiffs claim a sale was actually lost because a competing dealer (in this case Patterson) offered a lower price, ostensibly the result of a price break from Siemens in violation of section 2(a). The evidence presented, however, makes it clear that in two of the instances price was not a material consideration in the dentists' decisions. In one, the manufacturer's warranty was an important consideration. In the other, a volume discount was given. A third instance rests solely upon a letter and not an affidavit. The plaintiffs, as may be expected, argue that it is difficult to obtain such proof, and that the Court should accept a degree of uncertainty because of the difficulty in ascertaining business damages. However, it is quite different to accept a degree of uncertainty in proof of amount from accepting uncertainty of the existence of any damage whatsoever.

The plaintiffs have proved no injury in fact and, under these circumstances, the third cause of action must be dismissed.

### D. Plaintiffs' State Claims

Plaintiffs assert a variety of pendent state claims. Having dismissed the federal claims in this suit, the question of our continuing jurisdiction arises. It appears that diversity jurisdiction would lie in this case. Alternatively, we use our discretion to exert pendent jurisdiction here both because there is substantial overlap between the federal and state claims and in considerations of "judicial economy, convenience, and fairness to litigants." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (quoting *United Mine Workers v.*

*Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966)).

### 1. Donnelly Act Claim

■ The plaintiffs' fourth cause of action is based on the Donnelly Act, N.Y. Gen. Bus. Law § 340, the state counterpart to the federal Sherman Act. Analysis under section 340 closely parallels that done under the Sherman Act. *Optivision, Inc. v. Syracuse Shopping Center Assoc.*, 472 F.Supp. 665, 680–81 (N.D.N.Y.1979). For substantially the same reasons we granted defendants' motions for summary judgment on the Sherman Act claims, we grant defendants' motion on the Donnelly Act claim as well.

Plaintiffs protest that although Sherman Act and Donnelly Act analyses are similar, the Donnelly Act may be broader in sweep and, thus, its Donnelly Act claim is distinguishable. *Associates Capital Services Corp. v. Fairway Private Cars, Inc.*, 590 F.Supp. 10, 13 (E.D.N.Y.1982); *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 465, 381 N.Y.S.2d 426, 428, 344 N.E.2d 357, 359 (1976). This argument is of no avail. Whatever differences may exist, section 340, similar to section 1 of the Sherman Act, requires evidence of a "contract, agreement, arrangement, or combination." This is a threshold issue. Just as we earlier concluded that plaintiffs have offered no evidence which, taken as a whole, would allow us to draw a reasonable inference that there existed any illegal combination or conspiracy under the Sherman Act, so do we hold that there exists no evidence that would allow a similar inference to be drawn under the Donnelly Act.[28]

### 2. Tortious Interference with Contractual Relations and/or Business Relations

■ The fifth and sixth causes of action, which are brought only by Hayden,

---

**28.** We note that use of the word "arrangement" in section 340 may include relationships beyond the "contract[s], combination[s], or conspirac[ies]" proscribed by section 1 of the Sherman Act, and, to that extent, the Donnelly Act may be slightly broader in scope. *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 465, 381 N.Y.S.2d 426, 428, 344 N.E.2d 357, 359 (1976). The New York Court of Appeals has held, however, that "the

term, 'arrangement,' takes on a connotation similar to that with which it is found in company, and thus must be interpreted as contemplating a reciprocal relationship of commitment...." *Id.* Just as plaintiffs' evidence raises no inference of conspiracy, we also find that it is insufficient to raise a reasonable inference of an illegal "agreement," as that term is construed under section 340.

allege that Healthco and Patterson tortiously interfered with the Hayden-Siemens contractual relationship and tortiously interfered with the Hayden-Siemens business relationship. The evidence is quite clear that Siemens' termination of Hayden resulted from Hayden's refusal to sign Siemens' Authorized Dealership Agreement. There is no evidence that would allow us to infer that Healthco or Patterson were consulted or involved in that decision. Certainly we are not free to impute to Healthco or Patterson conduct independently pursued by Siemens. Accordingly, defendants' motions for summary judgment on these claims are granted as well.

### 3. Unfair Competition

 The seventh cause of action is a claim of unfair competition. Plaintiffs argue that the tortious interference by Healthco and Patterson, discussed in the preceding section, and the disparagement of Schein D.E. by Siemens and Healthco, discussed in the next section, each fall under the additional rubric of unfair competition. Holding as we do that there has been no tortious interference or disparagement, it follows that there has not been unfair competition. Summary judgment on this claim is granted.

### 4. Disparagement

 The eighth claim sounds in trade libel. No specific libels are set forth in the complaint. There is, therefore, a failure to allege with sufficient particularity the falsehoods in question. *Sadowy v. SONY Corp. of America,* 496 F.Supp. 1071, 1079 (S.D.N.Y.1980). Moreover, in the voluminous papers on the motion, the plaintiffs allude to only a few vague disparagements attributable to plaintiffs Siemens and Healthco, and these generally involve assertions to third parties that the manufacturer's warranty would not accompany Siemens' equipment sold by Schein D.E. These statements, which among other factors are true on their face, are not sufficient to sustain a trade libel claim in New York. *See generally Harwood Pharmacal Co. v. National Broadcasting Co.,* 9 N.Y. 2d 460, 214 N.Y.S.2d 725, 174 N.E.2d 602

(1961); *Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 199 N.Y.S.2d 33, 166 N.E.2d 319 (1960) (discussing New York trade libel law). Defendants' motion for summary judgment on the eighth claim is granted.

### 5. Prima Facie Tort

 Plaintiffs' ninth, and final, claim is a prima facie tort claim, relying on *Board of Education of Farmingdale Union Free School District v. Farmingdale Classroom Teachers Association, Inc.,* 38 N.Y. 2d 397, 407, 380 N.Y.S.2d 635, 644, 343 N.E.2d 278, 284 (1975) ("[W]henever there is an intentional infliction of economic damage, without excuse or justification, we will eschew formalism and recognize the existence of a cause of action."). This last-gasp attempt by plaintiffs to find a salvific peg on which to hang a cause of action suffers from a tortured reading of the facts.

Allowing a claim for prima facie tort to proceed to trial is warranted only when economic vindictiveness is the sole motivation for behavior. *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985); *Durham Indus., Inc. v. North River Ins. Co.,* 673 F.2d 37, 40 (2d Cir.1982). As is abundantly clear from the existing evidence, legitimate business reasons were behind all complained-of actions by the defendants. Consistent with *Farmingdale,* we are willing to "eschew formalism" in the service of justice, but not in lieu of logic and legal sufficiency. Summary judgment against plaintiffs' ninth claim is granted.

### III. Defendants' Counterclaims

Defendant Siemens has filed a barrage of counterclaims. Defendant Healthco has added a single counterclaim. Although the Healthco claim is imaginative, the Court gets the distinct impression that neither it, nor Siemens' battery of counterclaims, would ever have proceeded to litigation had the plaintiffs not sued first.

### A. Siemens' First Counterclaim

 The first counterclaim concerns statements made in the Schein D.E. catalog

that the goods sold by them carry a manufacturer's warranty as well as Schein D.E.'s warranty. Defendants allege these statements are in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Typical of motions for summary judgment, the opposing party disputes many factual issues set forth in the moving party's 3(g) statement. The following facts, however, do not appear to be truly in contest. Siemens became aware no later than 1982 that its equipment was being sold through Schein D.E.'s catalogs. Although some of this equipment was installed by Hayden, an authorized Siemens dealer, much of it had to be installed independently (since Hayden did not have nationwide facilities). No later than March of 1983, Siemens was aware that Schein D.E. was selling its full product line without authorized installation. The Schein D.E. catalog stated that all goods advertised came with a manufacturer's warranty. Siemens directed Schein D.E. to cease making these claims and later moved in this action for injunctive relief on that issue. After this Court enjoined Schein D.E. from stating in its catalog that a manufacturer's warranty applied to goods sold by mail order, Schein D.E. changed its promotional materials to make it clear that no Siemens warranty was supplied. Indeed, since January, 1985, when the fifth edition of the catalog appeared, Schein D.E. has stated expressly that Siemens' equipment purchased through Schein D.E. has no manufacturer's warranty. Moreover, at no time has the Schein D.E. catalog claimed that it was an authorized Siemens dealer. In advertising equipment, the Schein D.E. catalog makes it clear that installation is not included in the sale price.

Schein D.E. argues that Siemens' first claim should be dismissed because, contrary to the papers submitted by Siemens' counsel on the earlier application for a preliminary injunction, Siemens was aware that some of the Siemens equipment sold by Schein D.E. mail order was being installed by independent service organizations and that Siemens intentionally misled the Court to believe contrary. In particular, Schein D.E. relies upon deposition testimony of Siemens' Vitt that no later than June, 1982 he learned of the Schein D.E. use of independent service organizations.

At the time the earlier injunction was granted, Schein D.E. was selling Siemens' merchandise. Although it was not misleading purchasers into believing it was an authorized dealer, Schein D.E. did mislead them into believing that a manufacturer's warranty attached regardless of who did the installation. Since Siemens clearly had stated that its warranty depended upon authorized installation, this misrepresentation was misleading to prospective purchasers. Regardless of whether Siemens was on notice that Schein D.E. was using independent installers and nevertheless sold goods to it and might, therefore, be challenged in court concerning its disclaimer of warranty, the bald representation to customers that a warranty applied was misleading. This Court was well aware at the time of the original application for injunctive relief that certain of Siemens' personnel implicitly condoned Schein D.E.'s sales and installation methods. This, however, did not necessarily mean that Siemens could be compelled legally to honor its manufacturer's warranty thereafter as if the goods had been installed by an authorized dealer.[29] The protection of customers rather than benefit to Siemens motivated the existing injunction.

A reasonable argument can be made that the preliminary injunction need not be made permanent since, for the last couple of years, the Schein D.E. catalogs and promotional materials have eliminated any possibility of warranty-related confusion. This, however, has not been established adequately by plaintiffs in their motion for

---

**29.** The fact that on occasions in the early years Siemens did service Schein D.E.'s customers is not of controlling legal significance. Since the Schein D.E. catalog advertised the goods as being warranted by Siemens, Siemens had to protect its own reputation and good will. While Schein D.E. may have believed at first that Siemens might honor the warranties on the charade that the installation had been done by Hayden, it knew by April, 1983, at the latest, that Siemens was asserting it would *not* honor sales installed by unauthorized dealers.

summary judgment. Consequently, the motion for summary judgment must be denied.

### B. Siemens' Second and Third Counterclaims

The second counterclaim, pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleges that Schein D.E. should not be advertising Siemens' dental x-ray units in that they are not Siemens' products (because they have not been installed by authorized dealers). The third counterclaim is based on the same consideration as the second, but is brought under various New York statutes. There is simply no factual basis for these claims.

The products sold by Schein D.E. under the Siemens name are the identical products sold by authorized Siemens dealers. Siemens argues that its product is not what it manufactures but, rather, what it manufactures and its authorized dealers install. (If that were so, the product would not be solely Siemens'.) As indicated in the previous section, Schein D.E.'s customers are well aware that what they purchase from Schein D.E. is simply the manufactured product and not its installation. So long as this is understood, and it clearly is, the customers are not being misled. *See Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947) (sale by third party of reconditioned sparkplugs still bearing original manufacturer's trademark lawful so long as sold with notice indicating they had been reconditioned).

The case at bar is readily distinguishable from this Court's opinion in *Seiko Time Corp. v. Alexander's, Inc.,* 218 U.S.P.Q. (BNA) 560 (S.D.N.Y.1982). That case involved the importation of Seiko watches through the grey market. The advertising of those watches by defendant Alexander's implied that the manufacturer's warranty would be serviced by plaintiff Seiko Time, which was responsible for rendering warranty service for the Seiko manufacturer in the United States. In addition, it was established that Alexander's salespersons were advising customers directly that the grey market watches *were* warranted by Seiko. In reality, the warranty given by Alexander's actually provided that servicing would be done by agents of the importers of the grey market goods. Consequently, this Court enjoined Alexander's from advertising Seiko watches in a manner which implied that they were warranted by the manufacturer or its American distributor, Seiko Time. Similar circumstances are not present here.

The defendants' reliance on *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984), as that case relates to the possibility of consumer confusion between grey market imports and domestic, trademarked goods, is also misplaced.[30] Although Siemens attempts to show confusion in the minds of certain customers who had purchased through Schein D.E., the evidence does not reveal confusion so much as it does some dissatisfaction. Dentists who purchased Siemens' x-ray equipment and had problems which were not remedied by Schein D.E. or the independent installer, occasionally turned to Siemens for help. They did this, not because they had been advised that they received a Siemens warranty, but because they were looking for help wherever they could get it.

The unauthorized sale of a genuine trademarked product does not in itself constitute trademark infringement. *Stormor, A Div. of Fuqua Indus. v. Johnson,* 587 F.Supp. 275, 279 (W.D.Mich.1984). Where the goods are identical,[31] there is no possi-

**30.** Judge Leval's ruling in that case rested on statutes relating to the importation of grey market goods and certain Customs Service regulations not involved in this case. The issue was whether the grey market goods infringed under the trademark laws. This, in turn, involved Section 526 of the Tariff Act of 1930, 19 U.S.C.A. § 1526, which makes it illegal to import merchandise of a foreign manufacturer bearing a trademark owned by a United States citizen or corporation without written consent of the owner.

**31.** Siemens argues that the Food and Drug Administration (FDA) has indicated that a different product is involved when the installation is done by an unauthorized dealer. We have examined the communications with the FDA and find this argument to be frivolous.

bility of deception or confusion. *Diamond Supply Co. v. Prudential Paper Prod. Co.,* 589 F.Supp. 470, 475 (S.D.N.Y.1984). So long as Schein D.E. does not deceive its customers into believing they have received a Siemens warranty, which Schein D.E. has not done for a couple of years, there is no deception involved. Although Siemens may not want Schein to be advertising or selling its goods, so long as Schein D.E. is selling a genuine product, the use of the Siemens name in advertising is not improper. *Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969). Consequently, we grant plaintiffs' motions to dismiss the second and third counterclaims.

### C. Siemens' Fourth Counterclaim

Siemens' fourth counterclaim alleges that the plaintiffs are engaged in a "bait and switch" operation in which they feature Siemens in advertising but then attempt to switch prospective dentist customers off to other equipment.

Initially, it would appear that a manufacturer/supplier such as Siemens lacks standing to maintain an action for bait and switch under sections 349 and 350 of New York's General Business Law. Siemens fails to cite any case in which anyone other than a consumer has been permitted to bring an action under those sections, which obviously were designed to protect consumers. *See, e.g., Genesco Entertainment v. Koch,* 593 F.Supp. 743, 751–52 (S.D.N.Y. 1984). In addition, this counterclaim seems to be in factual conflict with the next counterclaim which complains about the plaintiffs' efforts to *obtain* Siemens' equipment. This claim takes the opposite approach in complaining that Schein D.E. is not doing enough to *promote and sell* Siemens' equipment.

This counterclaim must be dismissed, but we do not rest it upon either of the above propositions. Rather, the defendants have not made an adequate threshold showing sufficient to avoid summary judgment that, in fact, the plaintiffs are guilty of the offenses charged. Siemens makes reference to the possible testimony of a couple of witnesses. That testimony is not supported by any affidavit from the supposed witnesses indicating that they will so testify. Siemens has known of these witnesses for a couple of years and, consequently, the absence of affidavits is significant. In addition, the Schein D.E. catalog involved gives no indication of any bait and switch operation. The catalog advertises all of the major brands of dental x-ray units. Only a small portion of the Schein D.E. catalog is devoted to Siemens' equipment. Siemens is not unduly highlighted. The essential complaint made is that Schein D.E. will indicate the varying merits and demerits, including cost, of the various products. If these conclusory claims constitute evidence of a bait and switch practice, virtually every business person who sells a variety of brands could be accused of bait and switch.[32] Indeed, the sales figures offered show that Siemens accounted for 27% of all dental x-ray sales by Schein, D.E. in 1983, constituting the second most popular brand. In 1984, Siemens again was the second most popular brand offered by Schein D.E. To the extent that Schein D.E. does not sell more Siemens products, this appears attributable to Siemens' efforts to prevent Schein D.E. from selling its equipment.

On the entirety of the evidence presented upon the summary judgment motion, Siemens has failed to establish the purported bait and switch scheme. The motion for summary judgment, therefore, is granted.[33]

### D. Siemens' Fifth Counterclaim

The fifth counterclaim charges Schein D.E. with tortious interference with contractual relations. The relationship allegedly interfered with is the Authorized

---

**32.** The only evidence proffered by Siemens is that of a Healthco employee who formerly was employed by the plaintiffs. No specific dentists are identified as having been switched.

**33.** It does not appear that Siemens is charging Healthco with bait and switch. Yet, we note with interest that some of Healthco's practices with respect to dental equipment and x-ray sales appear rather similar to Schein's.

Dealership Agreement between Siemens and its dealers limiting sales to dentists. Since some of Siemens' dealers have made sales to plaintiffs (and to other non-dentists) in supposed violation of the Agreement, it is contended that Schein D.E. is guilty of tortious interference.

We note, initially, that the voluminous papers before the Court do not indicate any vigorous enforcement by Siemens of its Agreement. Indeed, the little that has occurred seems to be a result of this action and the filing of the counterclaims. The fundamental weakness in this counterclaim, however, is that Siemens does not suffer pecuniary injury because of the purchases made by Schein D.E. from authorized Siemens' dealers. Indeed, it profits from such sales.

▮ Siemens alleges pecuniary loss from expenses incurred in attempting to track down sales made by Schein D.E. of Siemens' equipment in order to learn from whom they have obtained the goods. These expenses, however, would appear to be a necessary part of enforcing the distributorship agreement to the limited extent that Siemens has been doing so. This does not constitute adequate proof of damages. As the Ninth Circuit said in *Landmark Dev. Corp. v. Chambers Corp.*, 752 F.2d 369, 373 (9th Cir.1985), in language that could easily apply to the case at bar: "[The manufacturer] offered no proof of measurable damages. [The manufacturer] was fully paid for the goods it shipped to Landmark and continues to sell goods to [its distributor]. [The manufacturer] claimed that the Landmark diversion 'disrupted' its sales in Southern California, but failed to support this conclusory and speculative assertion." Plaintiffs' motion for summary judgment on this counterclaim is granted.

### E. Siemens' Sixth and Seventh Counterclaims

▮ Siemens' sixth counterclaim contains a potpourri of alleged fraudulent statements and acts of Schein D.E. The seventh counterclaim charges Schein D.E. with conspiring with Siemens' dealers to obtain its equipment for resale. Siemens treats both of these counterclaims as fraud counterclaims. The seventh, however, could also be viewed as a variation on the fifth counterclaim involving alleged tortious interference. Since Siemens, in its opposing papers, has dealt with them as fraud counterclaims, we will approach them in that fashion.

Many of the alleged fraudulent acts have been addressed previously and need not be repeated here. To a great extent, the sixth counterclaim involves the notion that Hayden was fronting for Schein D.E. in order to obtain goods and that Siemens was deceived by this. At the outset, we would observe that there is substantial question as to whether any of Siemens' American sales representatives who got credit (and possibly commissions) for the sales made to Hayden were truly deceived as to Schein D.E.'s involvement. Moreover, even after they clearly were put on notice of the Hayden–Schein D.E. relationship, they continued to make sales to Hayden.[34] It is very apparent that Siemens' American sales representatives continued dealing with Hayden because it was Siemens' largest independent dealer in 1982 and a significant one in other years. In October, 1982, Siemens urged Hayden to increase its equipment purchases. We find the contention that it would not have made these and subsequent sales had Hayden and Schein D.E.'s employees not made misrepresentations which were relied upon by Siemens to be totally unbelievable. Consequently, materiality and reliance have not been established. *Miller v. Livingstone*, 25 A.D.2d 106, 267 N.Y.S.2d 249 (App.Div.), *aff'd per curiam*, 18 N.Y.2d 967, 278 N.Y.S.2d 206, 224 N.E.2d 715 (1966).

▮ In addition, on the sixth counterclaim and the seventh counterclaim, there

---

**34.** Siemens alleges that it did so simply upon the promises that Hayden would see that authorized dealers made installation in the future. This was obviously not a fulfillable promise since Hayden did not have nationwide authorized representatives and Schein was continuing to advertise Siemens' products.

is a total absence of any pecuniary injury to Siemens demonstrated by the motion papers. Siemens was clearly paid in full for all the products it sold to Hayden and for all the products that Schein D.E. purchased through other dealers. Actual pecuniary loss must be demonstrated to prevail on a fraud claim. *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F.Supp. 610, 617–18 (S.D. N.Y.1979). For all of the foregoing reasons stated in this section, as well as earlier, the motions to dismiss and for summary judgment as to the sixth and seventh counterclaims is granted.

### F. Siemens' Eighth Counterclaim

■■■ Siemens' eighth counterclaim charges Schein D.E. with defaming it by stating that Siemens would not honor its warranties on equipment sold by Schein D.E. This counterclaim revolves around a hypertechnical definition of the word "honor." It is undisputed that Siemens will not perform warranty services in connection with the sales of its equipment by plaintiff or others who do not have the installation done by an authorized installer.[35] In a general sense, therefore, Siemens is not honoring its warranty. Indeed, Siemens itself has used the word in the very same manner. Clearly, the defendants have neither shown nor properly alleged any malice on the part of Schein D.E. in making these statements. More important, Siemens has failed to establish any special damages which are an essential allegation of virtually all defamation claims. *Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319, 321–22 (1960). The counterclaim and Siemens' motion papers fail to show any pecuniary losses resulting from these purported defamations. While some attempts are made in the opposing papers to indicate the existence of losses, not a single customer is identified as having been lost due to the claimed disparagement. To the extent that the opposing papers attempt to expand upon the claimed defamation, and thereby amend the counterclaim, those efforts are treated as untimely, and are rejected. The motion to dismiss and for summary judgment on the eighth counterclaim is granted.

### G. Healthco's Counterclaim

■■ In its counterclaim, Healthco charges that the plaintiffs are "free riders" and, as such, are engaged in unfair competition under common law. About the best that can be said for this counterclaim is that it is novel and interesting.

For purposes of this case, a "[f]ree rider is a firm who takes advantage of a service or product that is valued by customers but provided by a different firm." H. Hovenkamp, *Economics and Federal Antitrust Law* § 4.3, at 114 (1985).[36] As a mail order discounter, Schein D.E. does not provide pre-sale, point-of-sale, or post-sale services, all of which are provided by full-service dealers such as Healthco. To the extent that Schein D.E. relies on customers "buying cheaply" from it but using the services provided by full-service dealers, Healthco alleges that Schein D.E. is a "free rider" and that "free riding," which heretofore has never been thought to be a compensable cause of action, should be illegal at common law.

We note from the outset that although protecting against "free riding" is a legitimate concern for manufacturers, discussed *supra*, the claim that many purchases of Siemens' equipment through Schein D.E. necessarily involve "free riding" is not supported by the evidence. Healthco contends that the only way of viewing dental x-ray

---

**35.** We need not concern ourselves with whether this type of disclaimer can always be effective. Besides the stated warranty, there may be other warranties implied by law which are enforceable against Siemens, particularly where the defect is one that could not have arisen from installation.

**36.** Of course, as Professor Hovenkamp makes clear, there are various forms of "free riding."

On a separate level, then, it is the dentist customers who "take a free ride on [Healthco's or Patterson's] services ... but then go to [Schein D.E.] to make their purchases." H. Hovenkamp, *Economics and Federal Antitrust Law* § 10.2, at 278 (1985). The "free riding" alleged in this case involves not the customers, but the discount dealer, Schein D.E.

equipment is in a dealer's showroom. This is clearly incorrect. Dentists can select their dental x-ray equipment by: (1) visiting dealer showrooms, where they can examine the equipment on display (showrooms are often small, however, so only a few pieces of equipment can be viewed, and federal regulations prohibit dealers from demonstrating the equipment in the showroom); (2) visiting the offices of colleagues to see how the equipment actually functions; (3) attending conventions, where manufacturers/suppliers demonstrate the equipment; and (4) comparing prices and features through mail order catalogs. It is undoubtedly true that some dentists who become interested in a piece of equipment seen in a mail order catalog may go to an authorized dealer to obtain more information. Although a former Hayden employee who worked in mail order attested that it was expected that, and Schein D.E. encouraged, dentists to look to full-service dealers for services, the notion that this occurred on a large scale makes little economic sense. By sending a prospective purchaser to an authorized dealer, a substantial risk is run that the purchase will then be made through that dealer.

Even if we were to conclude, however, that Schein D.E. explicitly or implicitly "free rides," Healthco has not stated a claim for unfair competition. The Second Circuit has said that "[c]ommon law unfair competition must be grounded in either deception or appropriation of the exclusive property of the plaintiff." *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 299 F.2d 33, 36 (2d Cir.1962). No deceptions are claimed here. The services of Healthco which dentist "free riders" may obtain are not being misappropriated in a legal sense. The interests of consumers in obtaining competitive prices are sufficiently great to prevent any judicial interference in these market transactions, even if they do bear a degree of economic unfairness.

The motion to dismiss Healthco's counterclaim is granted.

## Conclusion

The complaint is dismissed in all respects. The counterclaims, except for Siemens' first counterclaim, also are dismissed.

SO ORDERED.